ZEHMER, Judge.
Armando Rodriguez, claimant, appeals a workers’ compensation order contending that the judge of compensation claims erred in denying a portion of his claim for wage loss benefits and denying compensa-bility for his back, shoulder, and neck injuries. Because the order does not express sufficient findings to support denial of these claims in respect to all grounds argued by claimant, we reverse the denial of these claims and remand for further findings and clarification.
These claims involve injuries that occurred at two different times. Claimant’s first injury occurred on December 15, 1986, when he severely sprained his right ankle while working for his employer, Frito-Lay, Inc. At the time of this accident, claimant was a sales representative whose duties included delivering stock to stores, rotating existing stock, and assisting merchants in selling his employer’s products. Employer accepted the December 1986 accident as compensable and paid claimant temporary total disability benefits until he returned to work in January 1987. Dr. Hoover, the internal medicine specialist who treated claimant’s right ankle injury, testified that as a result of the December 1986 accident, claimant sustained a 5% permanent impairment of the right ankle.
Two weeks after returning to work in January 1987, claimant returned to Dr. Hoover with complaints of severe pain in his left foot. Dr. Hoover referred him to Dr. Kram, a podiatrist, who determined that the cause of claimant’s left foot pain was a neuroma that had developed as a result of claimant’s placing all of his weight on his left foot while recovering from the right ankle sprain. Dr. Kram excised the neuroma on February 11, 1987, and released claimant to return to work on March 11, 1987. Claimant did not advise employer or carrier that this was an employment-related injury because he was afraid that doing so would jeopardize his job. Instead, he submitted Dr. Kram’s bills to his health insurance provider. Claimant continued under the care of Dr. Kram’s associates, Drs. Murray, Clenden-ning, and Pryor, who gave claimant several steroid injections during the following months to relieve the pain he continued to experience in his left foot. Dr. Clenden-ning diagnosed claimant as suffering from “sinus tarsi syndrome” and stated that he needed additional surgery on the foot and should wear specially-designed orthotics. Dr. Murray prescribed a TNS unit and physical therapy sessions. At some point in time, carrier authorized these doctors to treat claimant and paid some of their bills. Later on, however, carrier stopped paying their bills and as a result, these doctors stopped treating claimant and he never received the additional surgery or the orthot-ics.
Claimant claims to have suffered a second accident on July 30, 1987, while working for the same employer. He states that *1169 while lifting boxes in the warehouse, he felt severe pain in his back, shoulders, neck, and head. On August 13, 1987, he started seeing Dr. Flynn, a chiropractor, about these problems, and submitted Dr. Flynn’s bills to his health insurance provider. Claimant testified that he chose to have his health insurance provider pay Dr. Flynn’s bills because he was experiencing difficulties with his supervisor and was afraid he would be fired if he complained about his physical problems. Claimant subsequently asked Dr. Flynn to submit his bills to the workers’ compensation carrier, and in April 1988, Dr. Flynn started billing carrier. Carrier did not pay any of the bills. Dr. Flynn testified that claimant’s back, shoulders, neck, and head injuries were caused by the repetitive lifting he performed at work.
On December 18, 1987, employer terminated claimant’s employment for not performing his duties in a satisfactory manner. Claimant performed a work search from the date of his termination until May 9, 1988, but testified that he discontinued sending work search forms to the carrier in March 1988 because carrier had not responded to the earlier job searches and had not provided him any new forms. Claimant testified that his right ankle and left foot pain became so severe that he could not stand for more than 2 or 3 hours per day. He continued to manage the apartment complex in which he lived, and on May 9, 1988, began working 3 to 4 hours per day, 5 to 6 days per week at a small restaurant his wife had opened. He assisted her in preparing food, such as sandwiches, and performed many of these activities from a sitting position.
On May 18, 1988, claimant saw Dr. Paz, a neurologist, pursuant to Dr. Murray’s referral. Dr. Paz performed a nerve conduction study on claimant’s feet and concluded that “they were both entirely normal.” Dr. Paz diagnosed claimant as having a soft tissue injury of the left foot that was chronic in nature.
On March 10, 1989, carrier sent claimant to Dr. Casóla, an osteopathic orthopedic physician, who examined claimant’s entire spine, pelvis, femur, and both feet. Dr. Casóla concluded that claimant has a 5% permanent partial impairment of the left foot, some restriction in the thoracic portion of the spine, and an altered gait resulting from either incisional pain or an inability to properly feel the surface of the ground as a result of the excision of the neuroma. He stated, “It is known that altered gait can manifest an alteration in the attitude of the body as well as the spine. So cervical, thoracic, lumbar, pelvis, all of that can be attributed to an abnormal gait.”
. On January 25, 1988, claimant filed a claim for benefits based on the right ankle injury, and a second claim for benefits based on the back, neck, and shoulder injuries. Claimant requested payment of temporary total and/or temporary partial disability benefits from the date of accident to the date of maximum medical improvement, permanent total disability benefits, permanent partial" disability benefits or wage loss benefits after MMI, medical benefits, remedial treatment, transportation expenses, penalties, interest, costs and attorney’s fees. Hearings on these claims were held on July 6, 1989, September 7, 1989, and January 9, 1990. On May 9, 1990, the judge of compensation claims entered a 20-page final order in which he attempted to summarize most of the testimony (all of which was by deposition). The order denied wage loss benefits after May 1, 1988; denied the claim for chiropractic care and all care related to claimant’s back, neck, and shoulder injuries; ordered employer and carrier to pay the bills of Dr. Hoover and Dr. Murray and his associates (the podiatrists); ordered employer and carrier to pay the bills for claimant’s physical therapy sessions; and ordered employer and carrier to provide claimant the orthot-ics prescribed by Dr. Clendenning.
Claimant’s first point on appeal contends that the order erroneously denied his claim for wage loss benefits for the periods of time subsequent to March 18, 1988. The order contains the following finding regarding the wage loss claim:
*1170 19. Claimant testified that the workers’ compensation carrier sent him job search forms on two occasions. He testified that he did not send the forms which were submitted to evidence [sic] the workers’ compensation carrier, however. He testified he did send Crawford & Company the forms they had sent to him filled in with the same information. Claimant testified none of his doctors told him not to work. He testified that no doctors from March, 1988, forward had placed restrictions on him. I find that the claimant did not perform a good job search for May, 1988 or for the months subsequent thereto. He is doing part-time work, essentially when he felt [sic] like it, and this is not grounds to excuse a job search. I find that his job search up to that point was adequate and done in good faith.
The order required employer and carrier to pay claimant:
1. Wage loss benefits for the two months for which Claimant filed wage loss forms. Claimant shall submit forms for the other months up through April, 1988, for which he can document a work search. Jurisdiction is reserved to resolve any disputes as relate to those forms.
Claimant argues that he should not have been denied wage loss benefits for failing to submit job search forms for the periods after March 18, 1988, because employer and carrier had not provided him with any job search forms after that date. Even though the order contains a discussion regarding the job search forms, wage loss benefits apparently were not denied on this ground as such benefits were awarded for the period of March 18,1988, through April 30, 1988, even though claimant had not filed job search forms covering that period.
Claimant further argues that the order erred in denying wage loss benefits based on testimony by claimant that none of his doctors had told him not to work, nor had they placed restrictions on him. We agree that it is difficult to reconcile the findings in the order with the evidence on this issue. If the order is based on a finding that claimant was not excused from searching for work after May 1988 because no doctor had placed restrictions on his work, such finding is contrary to the un-controverted medical evidence. Dr. Clen-denning, one of the podiatrists who treated claimant after the excision of the left foot neuroma, was asked about claimant’s work ability after March 1988, and stated:
A. I would think that he would be in extreme pain to be able to stay on his feet for any prolonged period of time.
Q. By prolonged period of time, what do you mean?
A. Greater than an hour, two hours.
Dr. Clendenning was then asked about claimant’s ability to work in September 1988, and responded:
A. Due to his fear of recurrent ankle sprain and instability in his right ankle, I think that he would be very leery about going back to work, and I think appropriately so.
I think with an unstable ankle, after you’ve twisted it severely, that it disables you.
Dr. Clendenning further stated that the orthotic device he prescribed for claimant would have helped stabilize claimant’s ankle, but that he was unable to provide claimant with the device because carrier had not paid the medical bills submitted by him and his associates. Dr. Casóla, the orthopedic surgeon who examined claimant at employer/carrier’s request on March 10, 1989, was also asked about claimant’s ability to work. He responded:
I find that the patient probably could return to work, but as soon as he was complaining of subjective discomfort in the areas of the foot, [I would] possibly put a weight limitation on what he could lift.
He explained that he would have to put claimant in a “training rehab mode to see what he could tolerate and that could vary anywhere from 25 to 70 pounds. There are labs that do evaluate that. On one examination, it’s kind of hard to assess.” When asked how long he thought claimant could stand at work, Dr. Casóla replied that he could not make a fair judgment about that *1171 after only one examination. Dr. Casóla did state in his evaluation report, however, that he would assign a 5% disability rating to claimant’s left foot. Thus, it appears that no doctor testified claimant could return to work with no restrictions whatsoever; rather, the uncontroverted medical evidence was that claimant could not stand for more than an hour or two at a time and would probably need lifting restrictions. This record does not support a finding that claimant was able to return to work without medical restrictions. Since it is reversible error to reject unrefuted medical testimony of an expert witness, Patterson v. Wellcraft Marine, 509 So.2d 1195, 1197 (Fla. 1st DCA 1987), we reverse the denial of this wage loss claim and remand for further findings and clarification.
Finally, with regard to wage loss benefits, the order found that claimant was doing part-time work, “essentially when he felt like it, and this is not grounds to excuse a job search.” Claimant argues that because his medical problems legitimately limited him to working 2 to 4 hours per day, he was only required to search for a job that required him to work 2 to 4 hours per day. He urges that since he worked 3 to 4 hours per day at his wife’s restaurant and worked as manager of the apartment complex in which he lives, this employment was sufficient to excuse him from searching for any further work. The order noted Dr. Clendenning’s testimony that claimant would not be able to stay on his feet for more than 2 hours at a time and that his fear of recurrent ankle sprain was appropriate, but it did not state whether this testimony was accepted. It appears that the order expected claimant to search for work without regard to medical restrictions, but, as discussed above, the record would not support such a finding. Thus, we remand with directions to make findings supported by the record on the claimant’s restrictions and the number of hours claimant is required to work, and determine why claimant’s part-time jobs were not sufficient to satisfy his job search requirement. The judge shall take additional evidence on this issue if he deems it necessary.
Claimant’s second point contends that the order errs in denying compensability and payment of medical expenses arising out of the July 30, 1987, accident. Several findings in the order appear to address whether claimant’s back, neck, and shoulder injuries are compensable, but the only discussion expressly related thereto is the following:
18. In Festa v. Teleflex, Inc., 382 So.2d 122 (Fla. 1st DCA 1980), the court set forth the criteria for a cause of action for repetitive trauma or exposure cases. These include the prolonged exposure or prolonged repetitive trauma; cumulative effect of this activity is the injury or aggravation or a pre-existing condition; and that the claimant has been subjected to a hazard greater than that to which the general public is exposed. Alternatively the claimant must demonstrate a series of occurrences the cumulative effect of which is the injury. In this case, the claimant does not show a specific identifiable accident in the traditional sense. There is no specific event that the claimant can point to which causes back, shoulder and neck pain. The claimant has shown a history of having lifted boxes and stacking those boxes. This went on for approximately two years on a twice per week basis. The claimant did demonstrate that any such event with twisting could cause the type of problems from which the claimant now suffers. While the claimant did not show specifically any twisting incidents and that medical care provider assumed the existence of such an event, that issue will not be dealt with at present. The claimant, as part of his burden of proof, is required to show that he has been subjected to a hazard greater than that to which the general public is exposed. Lifting a box which weighs no more than 20 lbs. is not shown to be a hazard greater than that to which the general public is exposed. In fact, there is no testimony regarding this issue, whatsoever. This is not the type of situation where the undersigned is willing to take judicial notice of efforts put forth by the general *1172 public. Members of the general public do lifting, do twisting and do other activities which the claimant also must do. It would require conjecture to establish this element of proof which is beyond the discretion of the undersigned. Indeed, the alternative theory, that there was a series of occurrences the cumulative effect of which is the injury is also not shown. The medical testimony seems to indicate that one such event could cause it, not that a series of events was necessary or that, indeed, that necessary sequence of twisting and lifting occurred with any regularity. Therefore I must deny compensability for the shoulder, back and neck problems from which the claimant now complains.
The findings just quoted are contradictory and misapply the law announced in Festa v. Teleflex. The order appears to accept the fact that “[Cjlaimant has shown a history of having lifted boxes and stacking those boxes. This went on for approximately two years on a twice per week basis.” Yet the order goes on to state that medical testimony did not indicate that the “necessary sequence of twisting and lifting occurred with any regularity.” Whether claimant twisted and lifted on a regular basis was not an area within a medical expert’s area of expertise; only claimant or someone familiar with claimant’s job was qualified to testify whether, as a matter of fact, he twisted and lifted on a regular basis. The order found that claimant had shown that he lifted and stacked boxes on a twice per week basis for approximately two years; it also accepted the proposition that claimant could prove his repeated trauma theory by showing a series of occurrences, the cumulative effect of which caused the alleged injury, and stated that claimant demonstrated that lifting and stacking boxes could cause the type of problems from which he is now suffering. The order denied compensability, however, because claimant did not point to any specific identifiable incident and because claimant did not show that he was subjected to a hazard greater than that to which the general public is exposed. Under the alternative theory that the claimant must demonstrate a series of occurrences, the cumulative effect of which is the injury, the claimant is not required to show, in addition, that he has been subjected to a hazard greater than that to which the general public is exposed. See Festa v. Teleflex, Inc., 382 So.2d 122, 124 (Fla. 1st DCA 1980). Dr. Flynn specifically testified that claimant’s back, neck, and shoulder injuries resulted from “too much lifting.” Because the reasons for denying the compensability of this second accident are based on contradictory findings and an apparent misapplication of the law regarding repeated trauma injuries, we reverse on this issue and remand with directions to make further findings and clarify the basis for denying compensability under this theory.
Additionally, we remand this issue for clarification of whether compensability was denied on the ground that claimant did not comply with the statutory notice provision. The order expressly found that claimant did not report his back, neck, and shoulder injuries to employer and carrier, but did not state that compensability was denied on that ground. While the record contains evidence that would support a finding of lack of notice, it also contains evidence that would support a finding that lack of notice could be excused. Section 440.185(1), Florida Statutes (1989), provides that failure to give notice of a claim shall not be a bar if such failure is excused for a satisfactory reason. In light of the evidence explaining claimant’s reason for not notifying employer or carrier of the accident, if compensability of this accident is to be denied for lack of notice, the order should contain findings as to whether noncompliance with the notice requirement should be excused, and if not, why.
The order also rejected without adequate explanation claimant’s claim that his back, shoulder, and neck problems have resulted from his altered gait which, in turn, was caused by his foot problems suffered as a result of the first accident. The order merely recites, “There is, however, no medical evidence to support this contention.” Yet, the record contains testimony *1173 of Dr. Casóla that claimant’s altered gait resulted from either the incisional pain or an inability to properly feel the surface of the ground as a result of the excision of the neuroma. Dr. Casóla further testified that one could develop a neuroma from taking all of his weight off of one foot and putting it on the other, and that an altered gait pattern can cause problems in the lumbar, thoracic, and cervical regions. Because acceptance of this medical testimony could support a finding of compensability of the injuries to claimant’s back, shoulder, and neck, we reverse the denial of compensation and medical benefits for these injuries and remand for further findings and clarification.
REVERSED AND REMANDED.
BARFIELD and ALLEN, JJ., concur.